**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

**Electronically Filed**

**LINDA G. HOLT,**

    **1017 Steamboat Way**
    **Villa Hills, KY  41017**

**JUDITH E. PREWITT,**

    **1870 Highway 27 South**
    **Falmouth, KY 41040**

**CYNTHIA L. ROEDER**

    **4 Colonel Point**
    **Wilder, KY  41071**

    **Plaintiffs,**

**v.**                                                          **Case No.**

**DENNIS B. GRIFFIN,**

    **3636 Turkeyfoot Road**
    **Elsmere, Kentucky 41018-2644**

**JOHN M. GRIFFIN,**

    **875 Squire Oaks Drive**
    **Villa Hills, Kentucky 41017-1342**

**ROBERT A. GRIFFIN,**

    **3227 Turkeyfoot Road**
    **Edgewood, Kentucky 41018-2849**

**MARTOM PROPERTIES,
LLC,**

      **1 Riverside Place
Covington, KY 41011**

**and**

**KEATING MUETHING & KLEKAMP, PLL**

      **One East Fourth Street
Suite 1400
Cincinnati, OH  45202**

      **Defendants.**

## COMPLAINT

Plaintiffs, Linda G. Holt, Judith E. Prewitt, and Cynthia L. Roeder, and, for their Complaint against the defendants, state as follows:

1.      This is an action under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and under state law claims for fraud, breach of fiduciary duty, civil conspiracy, tortious interference with an inheritance, negligence, and professional malpractice.  Defendants Dennis B. Griffin, John M. Griffin, and Robert A. Griffin ("the Griffin Defendants"), working together as a racketeering enterprise, engaged in a pattern of racketeering activity to defraud the plaintiffs, their sisters, of hundreds of millions of dollars in assets left to the plaintiffs by their parents in their wills and in trusts, and of the honest services of the defendants Dennis B. Griffin and John M. Griffin as Co-Executors of their father's Estate and as Co-Trustees of his 1967 Trust.

2.      The Griffin Defendants also committed fraud, violated their fiduciary duty to the plaintiffs, acted negligently, and engaged in a civil conspiracy to enrich themselves at the

2

expense of the plaintiffs.  Specifically, they wrongfully obtained for themselves assets worth hundreds of millions of dollars, including but not limited to the following:

      a.      The stock of Rosellen Griffin in Griffin Industries, Inc.;

      b.      The stock of John L. Griffin in Griffin Industries, Inc.;

      c.      The stock of John L. Griffin in Craig Protein, Inc.;

      d.      Valuable real estate and its rental income owned by John L. Griffin or his trust at the time of his death.

3.      The plaintiffs trusted and relied on the representations of the defendants.  As John L. Griffin and Rosellen Griffin became ill, the plaintiffs and their sisters took over the personal care of their parents, and the Griffin Defendants assumed more responsibility for the family business.  The plaintiffs trusted the Griffin Defendants to exercise this responsibility for the good of the entire family.  However, the Griffin Defendants executed the scheme described herein by lies, misrepresentations, and by abusing the trust they knew the plaintiffs placed in them to manage the family's affairs.  When those tactics ceased to be effective, they used intimidation and threats of economic harm.

4.      Defendant Keating, Muething & Klekamp, PLL, committed professional malpractice by violating their duty of loyalty to the plaintiffs under the Rules of the Kentucky Supreme Court and the Model Rules of Professional Conduct.  They did so by aiding the Griffin Defendants in their scheme at a time they were also attorneys for the plaintiffs or their children.

## I.  The Parties

5.      Plaintiff Linda G. Holt ("Linda") is a resident of Villa Hills, Kentucky, and the daughter of John L. Griffin, deceased ("Mr. Griffin").

6.     Plaintiff Judith E. Prewitt ("Judy") is a resident of Falmouth, Kentucky, and the daughter of Mr. Griffin.

7.     Plaintiff Cynthia L. Roeder ("Cyndi") is a resident of Wilder, Kentucky, and the daughter of Mr. Griffin.

8.     Defendant Dennis B. Griffin ("Dennis") is a resident of Elsmere, Kentucky, the brother of the plaintiffs, and at all relevant times:  (i) a member of the Board of Directors of Griffin Industries, Inc. ("Griffin Industries"); (ii) Trustee of the John L. Griffin January 20, 1967 Trust (along with the relevant amendments, the "1967 Trust"); (iii) co-executor of the Estate of John L. Griffin (the "Estate"); and (iv) co-executor of the Estate of Rosellen Griffin.

9.     Defendant John M. Griffin ("Griffy") is a resident of Villa Hills, Kentucky, the brother of the plaintiffs, and at all relevant times: (i) a member of the Board of Directors of Griffin Industries; (ii) Trustee of the 1967 Trust; (iii) co-executor of the Estate of John L. Griffin (the "Estate"); and (iv) co-executor of the Estate of Rosellen Griffin.

10.    Defendant Robert A. Griffin ("Robert") is a resident of Edgewood Kentucky, the brother of the plaintiffs, and at all relevant times, a shareholder, officer, and member of the Board of Directors of Griffin Industries.  Robert also negotiated the merger between Griffin Industries and Darling Industries, Inc., on behalf of Griffin Industries and its shareholders, including the plaintiffs.

11.    Defendant Martom Properties, LLC ("Martom Properties"), is a Kentucky limited liability company, with a principal place of business at 1 Riverside Place, Covington, Kentucky 41011.

4

12.     Defendant Keating, Muething & Klekamp, PLL ("Keating"), is a professional limited liability company with a principal place of business at One East Fourth Street, Suite 1400, Cincinnati, Ohio 45202.

## II. <u>Jurisdiction and Venue</u>

13.     This Court has jurisdiction pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331.

14.     This Court has venue pursuant to 28 U.S.C. § 1391 because the events at issue took place in this District.

## III. <u>Facts</u>

A.     <u>John L. Griffin</u>

15.     Mr. Griffin was born in Reading, Ohio, on July 12, 1922.  He married Rosellen Van Nest, and they had twelve children.  His seven sons were Dennis, Griffy, Robert, Martin, Thomas, Ronald (now deceased) and James Griffin ("Jim," now deceased).  His five daughters are Linda, Judith, Cyndi, Elizabeth Osborn ("Elizabeth"), and Janet Means ("Janet").

16.     In 1941, Mr. Griffin founded what ultimately became Griffin Industries, Inc. ("Griffin Industries" or "the Company").  Over the course of his lifetime, Mr. Griffin expanded Griffin Industries into a successful multimillion-dollar family business, with operations in numerous states.  Each of Mr. Griffin's surviving children worked in the Company, either as a summer job in high school or college or as a full-time employee.

17.     Mr. Griffin acquired an interest in Craig Protein, Inc. ("Craig Protein"), which grew to be a highly valuable company, and which he intended to leave to his daughters at his death.

18.     In addition, as Mr. Griffin expanded the Company, he bought property for it to use in its operations.  He generally bought the property personally and leased it to the Company to generate personal income.  From 1964 to 1978, Mr. Griffin assembled parcels of highly valuable commercial and industrial property, all of which he intended to leave to his daughters.

19.     Specifically, on December 5, 1964, Mr. Griffin purchased certain real property located in Pendleton County, Kentucky and more particularly described in the Deed attached as Exhibit 1 (the "Adams Property").

20.     On April 6, 1968, Mr. Griffin purchased certain real property located on or near Bradford Road in Pendleton County, Kentucky and more particularly described in the Deed attached as Exhibit 2 (the "Bradford Property").

21.     On October 31, 1968, Mr. Griffin purchased certain real property located in Hinds County, Mississippi and more particularly described in the Deed attached as Exhibit 3 (the "Jackson Property").

22.     On October 31, 1968, Mr. Griffin purchased certain real property located in Henderson, Kentucky and more particularly described in the Deed attached as Exhibit 4 (the "Henderson Property").

23.     On February 8, 1974, Mr. Griffin purchased certain property located in Campbell County at the intersection of U.S. 27 and Old Alexandria Pike, Cold Spring, Kentucky, which is more particularly described in the Deed attached as Exhibit 5 (the

"Cold Spring Property").  The Cold Spring Property was purchased in the name of "John L. Griffin, Trustee," although he was not at that time the trustee of the 1967 Trust or any other known trust.  Under Kentucky law, when a purchase of property by a trustee does not identify a trust, the title vests in the name of the trustee individually.

24.     On September 20, 1978, Mr. Griffin purchased certain real property located in Pendleton County, Kentucky and more particularly described in the Deed attached as Exhibit 6 (the "Jay Gee Property").

25.     As of 1978, Mr. Griffin owned personally the Adams, Bradford, Jackson, Henderson, Cold Spring, and Jay Gee properties.  All of them were or would be under lease to or used by Griffin Industries in its operations.  He also owned all of or a substantial portion of Craig Protein.

26.     On June 19, 1986, Mr. Griffin conveyed the Jackson Property, the Bradford Property, and the Henderson Property to the Trustees of the 1967 Trust pursuant to the Deeds attached as Exhibits 7 (Jackson Property), 8 (Bradford Property), and 9 (Henderson Property).  Mr. Griffin continued to own the Jay Gee Property, Adams Property, and the Cold Spring Property.  He also continued to own stock in Craig Protein.

B.     The Griffins' Estate Plans

27.     Beginning in 1967, Mr. Griffin and Mrs. Griffin created and modified their estate plans.  Their goal at all times was to ensure that each of their children received an equivalent share of Griffin Industries and that the shares of the Company would remain with the children and not be conveyed to their grandchildren, which they believed would be detrimental to their grandchildren's growth and well-being.

28.     On January 20, 1967, Mr. Griffin executed his Last Will and Testament (the "Will"), with several Codicils thereafter, attached and incorporated herein as Exhibit 10.  Mr. Griffin named his wife as Executrix, and if she predeceased him, his two oldest sons, Griffy and Dennis, to serve as Co-Executors upon his death.  Mr. Griffin modified his Will on several occasions, including on December 31, 1981, when Mr. Griffin executed his Fifth Codicil to his Will, providing that upon his death, his 59,671 shares of Griffin Industries stock would be shared equally among his children.

29.     On January 20, 1967, Mr. Griffin also created the 1967 Trust, naming The First National Bank of Cincinnati, Ohio, later known as Star Bank ("Star Bank") as Trustee.  The Trust Agreement for the 1967 Trust, and relevant Amendments Nos. 1, 2, 3, and 5, are attached and incorporated herein as Exhibit 11.  On October 2, 1978, Mr. Griffin amended his Trust to provide that upon his death, the Trust estate would be divided into seven equal shares and given to the seven children who were not at that time working full-time for Griffin Industries—Linda, Judith, Cyndi, Elizabeth Osborn, Tom, Martin, and Janet Means (the "Non-Working Children")—and distributed when the child turned thirty.  (Ex. 11, First Amendment to 1967 Trust at ¶ 7(b)).

30.     On April 25, 1967, Rosellen Griffin executed her Last Will and Testament, naming Mr. Griffin as the Executor.  The Will along with its Codicil provided that the residue of her estate would be bequeathed to the Rosellen Griffin Trust.  The Will and its Codicil are attached and incorporated herein as Exhibit 12.  On March 28, 1973, Mrs. Griffin executed a codicil to her Will, bequeathing all of her 15,291 shares of Griffin Industries stock to Mr. Griffin if he survived her, and otherwise to the Rosellen Griffin Trust.

31.     When Mrs. Griffin created the Rosellen Griffin Trust on April 25, 1967, she also named Star Bank as Trustee.  On December 31, 1981, Mrs. Griffin executed her Restated Trust Agreement.  The Restated Trust Agreement is attached and incorporated herein as Exhibit 13.  It provided that Star Bank would administer the assets of the Restated Trust for each child until he or she turned thirty, then distribute the child's principal.  (Ex. 13, Restated Trust Agreement at ¶¶ 1.4(d)(2)(A)).

32.     Because of the foregoing actions, then, before September 1983, Mr. Griffin's Estate plan called for his 59,671 shares of stock in Griffin Industries, 52.8 percent of the issued and outstanding stock, to be conveyed to his children in equal portions upon his death.  (Ex. 10, Fourth Codicil of Mr. Griffin's Will at ¶ 2).  It provided for the remainder of his assets to be conveyed to the 1967 Trust and divided among his seven Non-Working Children, and provided to each of them when he or she reached the age of thirty.  (*Id.*; Ex. 11, First Amendment to 1967 Trust at ¶ 7(b)).  Mrs. Griffin's Estate plan called for her 15,291 shares of Griffin Industries, 13.6 percent of the issued and outstanding stock, to be conveyed to Mr. Griffin if she predeceased him, and otherwise to her children in equal measure. (Ex. 12, Codicil to Will of Rosellen Griffin).

C.     <u>Mr. and Mrs. Griffin Become Ill</u>

33.     In the early 1980s, Mrs. Griffin developed Parkinson's Disease.  She became less able to take care of herself as her disease progressed, and the plaintiffs and their sisters took responsibility for their mother's care.

34.     On or about September 5, 1983, Mr. Griffin suffered a severe stroke.  He would never fully recover.  The plaintiffs and their sisters took care of their father, as they were already doing for their mother.

9

35.     As the plaintiffs and their sisters took over the personal care of their parents, the Griffin Defendants assumed more responsibility for the family business.  The plaintiffs trusted the Griffin Defendants to exercise this responsibility for the good of the entire family.

36.     On or about September 27, 1983, the Griffin Defendants caused the family attorney, Leonard Meranus, of the law firm now known as Thompson Hine LLP, to analyze the wills and trusts.  He concluded that if Mr. Griffin died first, the Non-Working Children would own a majority of the Griffin Industries stock.  This consequence could cause Dennis, Griffy, and Robert to be unable to control the Company.

37.     On or about August 1985, Mrs. Griffin died, and the Griffin Defendants began executing a scheme to prevent the Non-Working Children from assuming control of the Company, and to garner the great bulk of the Griffin Industries stock for themselves.

38.     On or about September 4, 1985, Dennis and Griffy caused the Campbell Probate Court to dismiss Mr. Griffin as Executor of Mrs. Griffin's Will, in violation of their mother's wishes, and to have themselves appointed as Co-Executors in his place. They did so by swearing in an affidavit that Mr. Griffin's stroke had caused him to be unable to take on the duties of Executor.

39.     On October 10, 1985, Dennis and Griffy caused Mr. Dewey McDougal to be terminated as Trustee of the Griffin Family Trust, and to appoint themselves as Co-Trustees in his place.

40.     On November 14, 1985, Dennis and Griffy caused Star Bank to be removed as Trustee of the 1967 Trust and to have themselves appointed in its place.

10

41.     As Executors and Trustees, Dennis and Griffy owed fiduciary duties to the plaintiffs and their sisters, the beneficiaries of their parents' Estates and Trusts.  Those fiduciary duties required them to further the interests of the beneficiaries over their own, and prohibited them from engaging in any self-dealing transactions.

42.     In addition, the Third Amendment to the 1967 Trust provided in paragraph 4(e) that no trustee shall engage in self-dealing or any transaction which poses a conflict of interest:  "No Trustee shall participate in the exercise of any discretion with respect to the distribution of . . . any portion of the Trust Property in which he . . . has any beneficial interest."  (*Id.* at § 4(e)).

43.     In addition to their duties as Executors and Trustees, Dennis and Griffy knew that the plaintiffs and their sisters imposed great trust in them to look after their interests.  They knew that they could draw upon that trust to deceive the plaintiffs and cheat them out of what was rightfully theirs.

D.      The Defendants' Fraud and Theft of the Plaintiffs' Inheritance from Their Parents

44.     Despite these duties, on or about November 29, 1985, the Griffin Defendants and Meranus conducted a family meeting at the Drawbridge Inn in Ft. Mitchell, Kentucky.   Mr. Griffin, disabled by his stroke, did not attend.   Dennis represented to the plaintiffs and to the other Griffin children in attendance:

    a.      That Dennis, Griffy, Robert, and Meranus only had the old 1967 Wills to rely upon, and not any codicils;

    b.      That the new tax laws, when applied to the old 1967 Wills, would cause a severe financial drain that would bankrupt Griffin Industries;

    c.      That the old 1967 plan would cost an extra $5,000,000 in death taxes;

     d.     That the old 1967 plan would place a tremendous tax burden on the Griffin children personally, in addition to the burden on the Company;

     e.     That Dennis, Griffy, Robert, and Meranus had devised a new "Plan" which would save the Company by giving the brothers all of Mrs. Griffin's stock; by giving Dennis, Griffy, Robert, and Jim all of Mr. Griffin's stock; and would give the girls cash at the time of Mr. Griffin's death;

     f.     That Mr. Griffin intended for Dennis, Griffy, Jim, and Robert to get all of his stock and for the girls to get cash instead of stock;

     g.     That Mrs. Griffin's Will gave to Dennis and to Griffy the right to take all of the stock and to give each of the girls cash instead of stock;

     h.     That the Plan was fair for all involved; and

     i.     That Griffin Industries would stop making distributions to its stockholders except to the extent necessary to pay taxes.

Each of these representations was false and misleading, as Dennis, Griffy, Robert, and Meranus well knew. Griffy, Robert, and Meranus appeared to agree with Dennis' representations and did not state any disagreement with Dennis' representations.

45. At the November 29, 1985, family meeting, Dennis fraudulently concealed the knowledge of him, Griffy, Robert, and Meranus:

     a.     That Dennis, Griffy, Robert and Meranus were in possession of Mrs. Griffin's and Mr. Griffin's current Wills, Codicils, Trust, Restated Trust, Amendments to Trust, Stock Purchase Agreement, and Amendments to Stock Purchase Agreement, all of which were entered into after the 1967 Wills and Trusts were created;

     b.     That Dennis, Griffy, Robert, and Meranus had caused analyses to be prepared by Meranus and members of his law firm that outlined the disposition of Mrs. Griffin's and Mr. Griffin's stock at their respective deaths, dependent upon the order of their deaths;

c.   That Dennis, Griffy, Robert, and Meranus knew that Mr. Griffin intended for all stock that passed under his Will would first be converted to non-voting stock and then pass equally to all of his children;

d.   That neither Mrs. Griffin nor Mr. Griffin had ever entered into a Trust, Amended Trust, made a Will, or made a Codicil that would exclude the plaintiffs and their sisters from inheriting their stock;

e.   That before Mr. Griffin's stroke in September, 1983, Mr. Griffin:

   (i)   Was concerned that Dennis, Griffy, Robert, and Jim were receiving too great a proportion of the income from Griffin Industries;

   (ii)   Had concluded that the plaintiffs and each of the other Non-Working Children should be given additional stock;

   (iii)   Had instructed Meranus to study the tax effect of making gifts to the Non-Working Children to increase their ownership of stock; and

   (iv)   Had executed a Codicil to his Will that provided that upon his death, his stock would be distributed equally to the plaintiffs and his other children.

f.   That after Mr. Griffin's stroke, Dennis, Griffy, Robert, and Meranus:

   (i)   Determined that Mrs. Griffin's Will, Codicil, and Restated Trust provided that after her death and the death of Mr. Griffin, her stock was to be divided into equal shares for all children, including the plaintiffs;

   (ii)   Determined that Mr. Griffin's Will, Codicils, and Trust provided that after his death, and after the death of Mrs. Griffin, all of his stock in his Trust and his Estate would be divided and distributed in equal shares to the Non-Working Children; and

   (iii)   Determined that Mrs. Griffin's and Mr. Griffin's Estates, as prepared by Meranus, would cause the plaintiffs and the other Non-Working Children to own

the majority of the stock of Griffin Industries if Mrs. Griffin died before Mr. Griffin.

g.      That after Mrs. Griffin's death, Dennis, Griffy, Robert, and Meranus met on numerous occasions to formulate an "overall redistribution" plan for Mrs. Griffin's and Mr. Griffin's Estate plans that would ignore their Wills, Codicils, and Trusts and provide for:

(i)      Dennis, Griffy, Robert, Marty, Tom, and Jim to take all of Mrs. Griffin's stock, and Dennis, Griffy, Jim and Robert to take Mr. Griffin's stock;

(ii)     To buy Mrs. Griffin's and Mr. Griffin's 66% ownership of the Company at a 40% discount from its book value; and

(iii)    To pay the 40% discounted cost of the purchased stock entirely from a distribution that they would direct Griffin Industries to make on the same stock that they were purchasing, thus obtaining all of the stock without paying for it from their own funds.

h.      If the plaintiffs and any of the Non-Working Children had been given the right to buy stock under the same conditions as Dennis and Griffy:

(i)      The plaintiffs could have paid for their proportionate stock purchased entirely from the distributions made to them; and

(ii)     There would have been no additional estate or income taxes to be paid.

46.     In or about December 1985, Robert met with Judy at her residence and repeated the false statements listed above.

47.     Dennis and Griffy, as Co-Executors of Mrs. Griffin's Estate, violated their fiduciary duties to the plaintiffs, beneficiaries of Mrs. Griffin's Restated Trust, by:

a.      Failing to disclose to the plaintiffs the material facts concerning Mrs. Griffin's Will, Codicil, the Estate property, its value, and Mrs. Griffin's 1981 Restated Trust;

b.      Failing to distribute Mrs. Griffin's stock to Star Bank as part of her Residuary Estate;

c.      Making the false representations set out above;

d.      Concealing from the plaintiffs their knowledge of the facts set out above when there was a duty to disclose those facts;

e.      Self-dealing in Estate assets by refusing to distribute the Griffin Industries stock as part of Mrs. Griffin's Residuary Estate, but instead, selling the stock to themselves at an improper discounted value for their own advantage;

f.      Refusing to permit the plaintiffs to buy a proportionate part of Mrs. Griffin's stock under the same terms and conditions as their own purchase of her stock; and

g.      Misrepresenting to the plaintiffs and their sisters the fair value of Mr. Griffin's stock by representing that it was a minority interest after making illusory sales to certain of Mr. and Mrs. Griffin's grandchildren ("the Designated Grandchildren") with the intention that Dennis, Griffy, Robert, and Jim would buy the Designated Grandchildren's stock on demand and would buy all of Mr. Griffin's stock, a total of more than 50% of the outstanding stock of Griffin Industries.

h.      Refusing the plaintiffs' repeated requests to read their mother's Will.

48.    Dennis and Griffy, as Co-Trustees of the 1967 Trust, violated their fiduciary duties to the plaintiffs by:

a.      Failing to preserve each asset of the 1967 Trust;

b.      Failing to administer the Trust estate fairly and impartially in accordance with the terms of the 1967 Trust;

c.      Self-dealing in the trust assets for their own advantage;

d.      Making the false representations set out above;

e.      Concealing their knowledge from the plaintiffs of the facts set out above;

      f.      Misrepresenting the value of Mr. Griffin's stock by wrongfully characterizing it as a series of minority purchases and through the use of illusory sales recoverable upon demand; and

      g.     Refusing to permit the plaintiffs to buy a proportionate part of Mr. Griffin's Stock under the same terms and conditions as their own purchase.

49.     On or about December 2, 1985, the Griffin Defendants caused Mr. Griffin to disclaim all of his interest in Mrs. Griffin's stock from her Estate, even though they knew he was not competent to make an informed decision to do so.  The disclaimer was filed in Campbell Probate Court on February 25, 1986.  Dennis and Griffy then caused the Estate of Mrs. Griffin to sell all of her stock to the six brothers at $117.20 per share, which was 60% of book value and substantially less than fair market value.  Dennis, as Chief Executive Officer of Griffin, waived the right of Griffin Industries to purchase the stock.

50.     On December 19, 1985, Dennis, Griffy, and Robert caused Mr. Griffin to disclaim his interest under Mrs. Griffin's Restated Trust even though they knew he was not competent to make an informed decision to do so.

51.     On or about January 3, 1986, Dennis, Griffy, and Robert caused the 1967 Trust to sell 4,508 shares of Griffin Industries stock from the 1967 Trust to the Designated Grandchildren, and to convey to Dennis and Griffy the option to repurchase that stock.  On or about January 7, 1986, Dennis and Griffy caused the 1967 Trust to sell its remaining 55,163 shares of Griffin Industries stock to Dennis, Griffy, Jim and Robert. They asserted that because 4,508 shares had been conveyed to the Designated Grandchildren only days before, they were entitled to purchase the stock at a "minority

discount," far below its true value.   Dennis, as Chief Executive Officer of Griffin Industries, waived its right to repurchase the stock.

52.     At the same time, Griffin Industries amended its bylaws to provide that upon a stock transfer, the Company would repurchase the stock at 60% of the adjusted book value.   Dennis, Griffy, Jim, Robert, and Griffin Industries entered an agreement that upon their death, the survivors would purchase the stock and Griffin Industries would waive its right to purchase.   The combination of the amendment to the bylaws and the stock purchase agreement ensured that the majority of the stock would remain in the hands of Dennis, Griffy, Jim, and Robert, and that the plaintiffs and their sisters would not be able to sell their stock for its fair market value.   When Jim later died on April 12, 1988, Dennis, Griffy, and Robert purchased his 23,492 shares of Griffin Industries stock, amounting to approximately 21 percent of the issued and outstanding stock of the Company.

53.     Mr. Griffin was disabled by his stroke and not capable of understanding or objecting to the Griffin Defendants' scheme.

54.     On September 25, 1987, Dennis and Griffy distributed most of Mrs. Griffin's Residuary Estate to her Trust, without Mrs. Griffin's stock, which they had purchased for only a fraction of its value.   Star Bank distributed the Trust to the children. Meranus represented to the plaintiffs and their sisters that the distribution came from the Estate, never telling them that their mother had a Trust.

55.     On June 18, 1990, Dennis and Griffy filed the final settlement of Mrs. Griffin's Estate.   The Campbell Probate Court approved it on July 12, 1990.

56.     On December 7, 1990, Elizabeth filed suit against Dennis, Griffy, Meranus, Thompson Hine, LLP, and Griffin Industries.  Mr. Griffin was later added as a defendant and indispensible party.  The Griffin Defendants falsely told the plaintiffs that the allegations were meritless and that Elizabeth had only filed the suit because she was greedy.

57.     On November 30, 1991, Mr. Griffin signed the Sixth Codicil to his Will that provided that all the property in his Estate would go to his five daughters or their children.  (Ex. 10, Sixth Codicil of Mr. Griffin's Will).  On December 21, 1993, Mr. Griffin reaffirmed his intent that all of his property at his death would go to the plaintiffs and their sisters when he signed the Seventh Codicil to his Will.  Indeed, in the Seventh Codicil, Mr. Griffin made clear that "all of my property is devised and bequeathed to my 1967 Trust as is set forth in my Last Will and Testament" and "all of my property [shall] go to my five daughters or their children at my death."  (*Id.* at Seventh Codicil).  The 1967 Trust also provided, by and through its Fifth Amendment, that at the death of Mr. Griffin, all "Trust property shall go to my five daughters equally, free of trust, and the Trust shall end."  (Ex. 11, Fifth Amendment of 1967 Trust).  On repeated occasions, the plaintiffs requested to see but were never shown Mr. Griffin's Will.

58.     Mr. Griffin died on April 9, 1995.

59.     As Co-Executors of their father's Will and Co-Trustees of the 1967 Trust, Griffy and Dennis held a fiduciary duty to act in the best interests of the beneficiaries— the plaintiffs and their sisters.  In particular, they had a duty to assemble all of the assets of Mr. Griffin and of the 1967 Trust and convey them to the plaintiffs and their sisters.  Those assets included the Jackson Property, the Henderson Property, and the Bradford

Property, which were owned by the 1967 Trust, and the stock of Craig Protein, as well as Cold Spring Property, the Adams Property, and the Jay Gee Property, which were owned by Mr. Griffin personally.

60.     Instead, the Griffin Defendants joined together to defraud their sisters further of their rightful inheritance.  In or about July 1995, the Griffin Defendants discussed the death of their father and the impending conveyance of the Properties with the plaintiffs and their sisters.  They knew that if the terms of the Will and 1967 Trust were followed, the plaintiffs and their sisters would receive the Properties, which were leased to or used by Griffin Industries as its Company headquarters and in its Company operations.  They knew the sale of these properties at fair market value would bring many millions of dollars, and the lease of the properties by Griffin Industries would likewise bring substantial income to the plaintiffs and their sisters.

61.     Rather than follow their duties as Co-Executors of the Will and Co-Trustees of the 1967 Trust, Griffy and Dennis, aided and abetted by Robert, Martin, and Thomas, created Martom Properties to serve as the vehicle for their fraud.  Martin and Thomas were named as managers.

62.     On July 14, 1995, four months after their father's death, Griffy and Dennis, as Co-Trustees of the 1967 Trust, conveyed the Jackson Property, the Henderson Property, and the Bradford Property to Martom Properties.  Copies of the Deeds evidencing this conveyance are attached as Exhibits 14 (Jackson Property), 15 (Henderson Property), and 16 (Bradford Property).

63.     On the same date, July 14, 1995, and despite the explicit language of the Will, which required that all property of Mr. Griffin be conveyed to the 1967 Trust,

Dennis and Griffy, as Co-Executors of the Estate, conveyed the Adams Property and the Jay Gee Property to Martom Properties instead.   A copy of the Deed evidencing this conveyance is attached as Exhibit 17.

64.     The Adams Property and the Jay Gee Property were conveyed to Martom Properties in violation of the pour-over provision in the Will, as well as the prohibition against self-dealing and conflicts of interest contained in the 1967 Trust.

65.     On information and belief, and at all times relevant, the Properties were leased to or otherwise used by Griffin Industries, which ultimately benefited the Griffin Defendants by virtue of their large holdings in Griffin Industries.

66.     Upon acquiring the Properties, Martom Properties became the lessor and began receiving sizeable rent payments that should have been paid to the plaintiffs and their sisters.

67.     Upon information and belief, the Jackson Property, the Bradford Property, the Henderson Property, the Adams Property, and the Jay Gee Property were conveyed to Martom Properties for less than fair market value.

68.     In addition to the fraud related to the Properties, the Griffin Defendants defrauded the plaintiffs out of their interest in Craig Protein.  Mr. Griffin owned this property at his death, and it should have been conveyed to the 1967 Trust for the benefit of the plaintiffs and their sisters.  Instead, the Griffin Defendants caused it to be sold to Griffin Industries, where they were the majority shareholders, and, upon information and belief, for a fraction of its true value.

69.     Dennis and Griffy, as Co-Executors of Mr. Griffin's Estate and as Co-Trustees of the 1967 Trust, violated their fiduciary duties to the plaintiffs by:

     a.      Failing to disclose to the plaintiffs the material facts concerning Mr. Griffin's Will, Codicils, the Estate property, its value, and Mr. Griffin's 1981 Restated Trust;

     b.      Causing Mr. Griffin and the 1967 Trust to convey his stock in the Company to them before his death;

     c.      Making the false representations set out in Paragraph 44 above;

     d.      Concealing from the plaintiffs their knowledge of the facts set out in Paragraph 45 above when there was a duty to disclose those facts;

     e.      Refusing to distribute the assets of Mr. Griffin's Estate to the 1967 Trust;

     f.      Refusing to distribute the assets of the 1967 Trust to the plaintiffs and their sisters;

     g.      Self-dealing in the assets of Mr. Griffin's Estate and the 1967 Trust by causing those assets to be sold to Griffin Industries and to Martom Properties at an improper discounted value for their own advantage;

     h.      Refusing to permit the plaintiffs to buy a proportionate part of Mr. Griffin's stock under the same terms and conditions as their own purchase of her stock; and

     i.      Misrepresenting to the plaintiffs and their sisters the fair value of Mr. Griffin's stock by representing that it was a minority interest after making illusory sales to certain of Mr. and Mrs. Griffin's grandchildren ("the Designated Grandchildren) with the intention that Dennis, Griffy, Robert, and Jim would buy the Designated Grandchildren's stock on demand and would buy all of Mr. Griffin's Stock, a total of more than 50% of the outstanding stock of Griffin Industries.

70.     The Griffin Defendants fraudulently concealed the knowledge set forth in Paragraph 45 above.

E.      The Misappropriation of the Cold Spring Property

71.     Another valuable asset of the Estate at the time of Mr. Griffin's death was the Cold Spring Property, where Griffin Industries had built its headquarters, and worth several million dollars.   The records of the Campbell County Property Valuation Administrator ("PVA") and the Clerk's office indicate that until December 16, 2010, the Cold Spring Property had a taxable value of $2,137,600.  In early 2010, Griffin Industries built an addition on the Cold Spring Property costing approximately $4 million dollars; thus in 2010 the value of the Cold Spring Property exceeded $6 million dollars.  For Tax Year 2013, the taxable value of the Cold Spring Property is $5,824,686.  Copies of the PVA records are attached as Exhibit 18.

72.     Despite the ownership by Mr. Griffin, it was not included in his Estate, not conveyed to the 1967 Trust, and not distributed to the plaintiffs and their sisters.

73.     The Griffin Defendants, by reason of their capacity as officers and directors of Griffin Industries at all relevant times were in a unique position to know, did know, should have known, or were reckless in not knowing that the Cold Spring Property was titled in the name of "John L. Griffin, Trustee."

74.     On or about October 22, 2010, Robert called the plaintiffs to inform them that Griffin Industries would be merging with Darling Industries, Inc. ("Darling Industries").   Although the Griffin Defendants had been negotiating the merger for months, they did not inform the plaintiffs or their sisters of the merger until only a few weeks before the closing of the merger.

75.     On or about October 25, 2010, the Griffin Defendants caused draft copies of a portion of the merger agreement with Darling Industries to be sent by Federal

Express to the plaintiffs.  The plaintiffs were never provided the final version of the merger agreement, nor the schedules or exhibits to the merger agreement, despite repeated requests.  On or about October 26, 2010, Robert telephoned each of the plaintiffs and told them there was no reason to read the merger agreement.

76.    On or about October 31, 2010, Cyndi received a Griffin Industries shareholder list by accident, when it had been inadvertently placed within some tax documents intended for her daughter.  The shareholder's list showed that the Griffin Defendants and their families owned enormously more stock than the plaintiffs and their sisters.  In addition, the shareholder's list showed that the Griffin Defendants had transferred some of their stock to their children, despite their telling the plaintiffs and their sisters that such transfers were impermissible.  Finally, the shareholder's list showed that Elizabeth owned approximately twice as much stock as the plaintiffs, indicating to them that her lawsuit had been successful, contrary to what the Griffin Defendants had told the plaintiffs.

77.    On or about November 2, 2010, the plaintiffs met with Robert and Griffy at Linda's home.  They complained that they had not been treated fairly in the distribution of their parents' stock, but Robert blamed the situation on Dennis, whom Robert told them had believed the plaintiffs had enough stock.  They also complained that they had been prevented from transferring Company stock to their children.

78.    On or about November 5, 2010, the plaintiffs attended a special Shareholder's Meeting of Griffin Industries.  At the end of the meeting, Robert mentioned that there was an issue with the title of the Cold Spring Property.  Griffy falsely told the plaintiffs that the title issue was a mistake.

79.     At the same meeting, family attorney Louis Solomine, of the firm of Thompson Hine, LLP, falsely told the plaintiffs that the trust was either lost or dissolved.

80.     The plaintiffs did not know until that time that the Estate or the 1967 Trust had any ownership in the Cold Spring Property, or that such property should have been conveyed to them and their sisters pursuant to the express terms of their father's Will and the 1967 Trust.

81.     On or about November 14, 2010, Robert met with the plaintiffs at Linda's residence and falsely told them they had no legitimate claim on the Cold Spring Property, but they needed to execute a Special Warranty Deed conveying the Cold Spring Property to Griffin Industries for only $10.00.

82.     On or about November 22, 2010, the plaintiffs attended a meeting at Company headquarters to sign documents to terminate certain leases on property leased to the Company.   At that meeting, also attended by Robert and Solomine, Solomine falsely denied there was ever a trust for their benefit.   Robert told them they needed to sign a Special Warranty Deed.   The Special Warranty Deed that the Defendants presented to the plaintiffs acknowledged that the Cold Spring Property was owned by Mr. Griffin when he died, stating that:

> Under Kentucky law, a deed which purports to convey title to a trustee of a trust, but which does not specifically identify the trust, by operation of law vests title in the grantee in his individual capacity.

A copy of the Special Warranty Deed which the Defendants presented to the plaintiffs is attached as Exhibit 19.  Despite the language of the deed, Robert told the plaintiffs that if they did not sign, Griffin Industries would not be able to complete the merger, and the shareholders would have to pay $30 million as a penalty.  Against their wishes and under

the threat of incurring a $30 million liability, Cyndi, Cyndi's husband, and Linda signed the deed.

83.     On or about November 23, 2010, the Griffin Defendants caused an electronic message to be sent to Elizabeth's attorney, Bradford Stevens, stating that all of the plaintiffs had signed the Special Warranty Deed.

84.     On or about December 1, 2010, Cynthia called Solomine, asking for information about and a copy of Mr. Griffin's 1967 Trust, and to revoke the signatures of Cyndi, Cyndi's husband, and Linda on the deed.  Despite her request, he took no steps to revoke their signatures or provide her with a copy of Mr. Griffin's 1967 Trust.

85.     On or about December 4, 2010, Judy met with Robert at her residence and told him she was upset about how the allocation of their parents' stock, the sale of the Company, and the transfer of the Cold Spring Property had been handled.

86.     On or about December 5, 2010, the plaintiffs met with Griffy at Linda's residence.  The plaintiffs told him they were upset about how the allocation of their parents' stock, the sale of the Company, and the transfer of the Cold Spring Property had been handled.

87.     On or about December 6, 2010, the plaintiffs met with Griffy and Robert. Robert offered up to $200,000 if the plaintiffs and the sisters agreed to convey the Cold Spring Property, and he threatened that the merger between Griffin Industries and Darling Industries would fail and each beneficiary would be responsible for damages from the failed $850 million dollar merger.  The plaintiffs were instructed to talk to Elizabeth and determine whether she would sign the Special Warranty Deed.

88.     On or about December 6, 2010, the Griffin Defendants caused the use of interstate wires by causing an interstate telephone call to be made to Elizabeth about the Special Warranty Deed.

89.     On or about December 7, 2010, the plaintiffs met with Griffy, Robert, Marty, Tom, and Janet, and the plaintiffs told them that Elizabeth would not sign the Special Warranty Deed.

90.     Unbeknownst to the plaintiffs, on December 14, 2010, Dennis, as Co-Trustee of the 1967 Trust, delegated to Griffy, the other Co-Trustee, all powers and discretion with respect to the disposition of the Cold Spring Property, including the right to transfer such property to Griffin Industries on whatever terms and conditions Griffy determined.  A copy of this Delegation is attached as Exhibit 20.  On the same date, Dennis also delegated his authority as Co-Executor of the Estate of Mr. Griffin and as Co-Trustee of the 1967 Trust to Griffy to dispose of the Cold Spring Property.

91.     Unbeknownst to the plaintiffs, on December 16, 2010, Griffy, as Trustee of the 1967 Trust, purportedly transferred the Cold Spring Property to Griffin Industries by a Quit Claim Deed, which is attached as Exhibit 21.  According to the Quit Claim Deed, only $1.00 was paid by Griffin Industries for the Cold Spring Property.  Unbeknownst to the plaintiffs, on December 16, 2010, Griffy, as Executor of the Estate, also purportedly transferred the Cold Spring Property to Griffin Industries by a Fiduciary Deed, which is attached as Exhibit 22.  Again, only $1.00 was paid by Griffin Industries for the Cold Spring Property.

92.     At the time that Griffy executed the Quit Claim Deed and Fiduciary Deed referenced above, the Griffin Defendants were major stockholders in Griffin Industries

and stood to benefit financially from a merger valued at $850 million between Griffin Industries and Darling Industries.   The merger was completed the day after Griffy purportedly transferred the Cold Spring Property to Griffin Industries—December 17, 2010.

93.   Dennis and Griffy, as Trustees of the 1967 Trust and Co-Executors of the Estate, held a relationship of special confidence, both in equity and in law, and were bound to act in good faith, with utmost loyalty, and with due regard to the interests of the plaintiffs.

94.   As beneficiaries of the 1967 Trust and the Estate, the plaintiffs reposed trust and confidence in Dennis and Griffy.  The plaintiffs relied upon them to act with the utmost care in the administration and distribution of Estate and 1967 Trust property, and until November 2010, had no reason to believe that their brothers had acted contrary to the wishes of their father, contrary to the wishes of their mother, and in their own self-interest.

95.   At the time that Griffy signed the Quit Claim Deed and Fiduciary Deed referenced above, the Griffin Defendants and their immediate family members were major stockholders in Griffin Industries and stood to, and in fact did, gain hundreds of millions of dollars from the $850 million dollar merger between Griffin Industries and Darling Industries on December 17, 2010.

96.   As a result of the Griffin Defendants' wrongful activities, Mr. Griffin's known wishes with respect to his daughters were flagrantly disregarded, and the Griffin Defendants fraudulently conveyed the Cold Spring Property to Griffin Industries to further their own selfish interests.  This conduct was in direct violation of the terms of the

Will and 1967 Trust, which expressly proscribed such self-dealing and conflicts of interest.

97.     The Griffin Defendants acted with oppression, fraud, and malice towards the plaintiffs by acting in their own self-interest and intentionally acting without due regard for the plaintiffs' rights and without adequate compensation for same.   The plaintiffs therefore seek both compensatory and punitive damages for the Griffin Defendants' willful and deliberate misconduct.

F.     <u>The Wrongful Actions of Keating Muething & Klekamp PLL</u>

98.     The Griffin Defendants were assisted in their activities by attorneys from Keating, who filed a motion in the Campbell Probate Court to re-open Mr. Griffin's Estate to convey the Cold Spring Property to Griffin Industries.

99.     Under the Kentucky Rules of Professional Conduct, a lawyer may not represent a client if that representation will be directly adverse to another client, unless each client gives informed consent in writing.  Ky. Sup. Ct. R. 3.130(1.7).  At the time that attorneys from Keating filed the motion on behalf of Griffy to divest the plaintiffs of their interest in the Cold Spring Property, it was also representing the plaintiffs or their children and owed them a duty of undivided loyalty.

100.     Keating took this action without notice or consent of the plaintiffs or their sisters, who were the ultimate beneficiaries of the Estate and the true owners of the Cold Spring Property.   The plaintiffs were not aware of Keating's wrongdoing until August 2012.

101.    Keating acted with gross negligence and willful disregard of the plaintiffs' rights.   The plaintiffs therefore seek both compensatory and punitive damages for Keating's actions.

## IV.  Claims for Relief

COUNT I
RACKETEERING
(Against Defendants Dennis
Griffin, John M. Griffin, and Robert Griffin)

102.    The plaintiffs reallege the facts set forth in Paragraphs 1 through 101 above.

103.    Section 1964(c) of Title 18, United States Code, of the Racketeer Influenced and Corrupt Organizations Act states that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

## The Enterprise

104.    From a time in or about September 1983, and continuing until December 2010, the Griffin Defendants acted as an association in fact to commit criminal acts, including to commit mail fraud and wire fraud, and to violate the Hobbs Act, all in an effort to deprive the plaintiffs of stock in Griffin Industries, stock in Craig Protein, real property, and other assets bequeathed and devised to the plaintiffs by Mr. Griffin and Mrs. Griffin, and to acquire those assets for themselves, and to deprive the plaintiffs of the honest services of Dennis and Griffy as Co-Executors and Co-Trustees.

105.   The association of the Griffin Defendants constitutes an "enterprise" as defined by Title 18, United States Code, Section 1961(4).   The enterprise constitutes an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.   The enterprise was engaged in, and its activities affected, interstate commerce, in that it controlled and affected the purchase, sale, and distribution of stock in a company doing business in Kentucky and other states.

106.   The purposes of the enterprise included the following:

a.   To wrongfully deprive the plaintiffs of their rightful inheritance of the stock of Mr. Griffin in Griffin Industries, and to acquire it for their own purposes;

b.   To wrongfully deprive the plaintiffs of their rightful inheritance of the stock of Mrs. Griffin in Griffin Industries, and to acquire it for their own purposes;

c.   To wrongfully deprive the plaintiffs of their rightful inheritance of the Bradford, Henderson, Adams, Jackson, Jay Gee, and the Cold Spring Properties, and to acquire them for their own purposes;

d.   To wrongfully deprive the plaintiffs of their rightful inheritance of the stock of Mr. Griffin in Craig Protein, and to acquire it for their own purposes;

e.   To wrongfully deprive the plaintiffs of the income from the leases of the Bradford, Henderson, Adams, Jackson, Jay Gee, and the Cold Spring Properties, and to acquire that income for their own purposes; and

f.   To wrongfully obtain and maintain control of Griffin Industries, in order to direct it to pay them lucrative salaries, benefits, and perquisites.

107.   The Griffin Defendants participated in the operation and management of the enterprise by formulating the schemes to accomplish the goals listed above, by

executing those schemes by racketeering acts, and by directing their attorneys and others in the means necessary to accomplish them.

## The Pattern of Racketeering Activity

108.    From a time in or about September 1983 through December 2010, the Griffin Defendants, being persons associated with the enterprise above, an enterprise engaged in, and the activities of which affected interstate commerce, unlawfully conducted the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of the Racketeering Acts set forth below.  The Racketeering Acts were continuous from November 1985 to December 2010.  They are related in that they were committed by the same members of the racketeering enterprise, using the same methods of illegal activity, and dedicated to the common goals listed above.

## The Racketeering Acts

### Racketeering Act Nos. 1, 2, 3, 4 and 5:  Mail Fraud in the Theft of Mrs. Griffin's Stock in Griffin Industries

109.    The Plaintiffs incorporate Paragraphs 1 through 107 of the Complaint as if fully set forth below.

110.    From in or before November 1985, and continuing until July 1990, the Griffin Defendants devised and participated in a scheme to defraud the plaintiffs.  The scheme was intended to deprive the plaintiffs of money and property and the honest services of Dennis and Griffy as Co-Executors and Co-Trustees.  The scheme was also intended to enrich the Griffin Defendants and their families.

111.    The Griffin Defendants knew that Mrs. Griffin intended for her stock to be bequeathed in equal shares to each of her children.  They further knew that the duties of

Dennis and Griffy as Co-Executors of Mrs. Griffin's Estate required them to exercise their fiduciary duty solely for the benefit and the best interest of the plaintiffs and their sisters. In spite of this knowledge, the Griffin Defendants made and caused others to make the false statements set forth in paragraph 44 above.

112. The Griffin Defendants omitted the material facts set forth in 45 above.

113. Dennis and Griffy, as Co-Executors of Mrs. Griffin's Estate, violated their duty of honest services to the plaintiffs, beneficiaries of Mrs. Griffin's Restated Trust, by taking or failing to take the actions set forth in paragraph 46 above.

114. The plaintiffs relied on the Griffin Defendants statements and omissions to their detriment by not objecting to the plan.

115. To execute the scheme to defraud, the Griffin Defendants caused the use of the United States mail, related to the Racketeering Act Nos. 1-5, as follows:

| | |
|---|---|
| Racketeering Act No. 1 | Check mailed to Linda Holt for proceeds of Mrs. Griffin's Estate, on or about September 25, 1987. |
| Racketeering Act No. 2 | Check mailed to Judith Prewitt for proceeds of Mrs. Griffin's Estate, on or about September 25, 1987. |
| Racketeering Act No. 3 | Check mailed to Cynthia Roeder for proceeds of Mrs. Griffin's Estate, on or about September 25, 1987. |
| Racketeering Act No. 4 | Final settlement of Mrs. Griffin's Estate mailed to Campbell Probate Court, on or about June 18, 1990. |
| Racketeering Act No. 5 | Approval of final settlement of Mrs. Griffin's Estate, mailed from Campbell Probate Court on or about July 12, 1990. |

116.    The Griffin Defendants' acts constitute mail fraud as prohibited by Title 18, United States Code, Section 1341 and 1346.

### Racketeering Act Nos. 6, 7, 8, 9 and 10:  Mail Fraud
### in the Theft of Mr. Griffin's Stock in Griffin Industries

117.    The plaintiffs incorporate Paragraphs 1 through 115 of the Complaint as if fully set forth below.

118.    From in or before November 1985, and continuing until July 1990, the Griffin Defendants devised and participated in a scheme to defraud the plaintiffs.  The scheme was intended to deprive the plaintiffs of money and property and the honest services of Dennis and Griffy as Co-Executors and Co-Trustees.  The scheme was also intended to enrich the Griffin Defendants and their families.

119.    The Griffin Defendants knew that Mr. Griffin intended for a substantial portion of his stock to be conveyed to the plaintiffs and their sisters.  They further knew that the duties of Dennis and Griffy as Co-Executors of Mrs. Griffin's Estate required them to exercise their fiduciary duty solely for the benefit and the best interest of the plaintiffs and their sisters.  In spite of this knowledge, the Griffin Defendants made, and caused others to make the false statements set forth in paragraph 44 above.

120.    The Griffin Defendants omitted the material facts set forth in paragraph 45 above.

121.    Dennis and Griffy, as Co-Trustees of the 1967 Trust, violated their duty of honest services to the plaintiffs by taking the acts or failing to take the acts set forth in paragraph 46 above.

122.    The plaintiffs relied on these statements or omissions to their detriment by not objecting to the plan.

123.    To execute the scheme to defraud, the Griffin Defendants caused the use of the United States mail, related to the Racketeering Act No. 6, 7, 8, 9, and 10, as follows:

| | |
|---|---|
| Racketeering Act No. 6 | Check mailed to Linda Holt for proceeds of Mr. Griffin's Estate and 1967 Trust, on or about March 28, 1998. |
| Racketeering Act No. 7 | Check mailed to Judith Prewitt for proceeds of Mr. Griffin's Estate and 1967 Trust, on or about March 28, 1998. |
| Racketeering Act No. 8 | Check mailed to Cynthia Roeder for proceeds of Mr. Griffin's Estate and 1967 Trust, on or about March 28, 1998. |
| Racketeering Act No. 9 | Final settlement of Mr. Griffin's Estate mailed to Campbell Probate Court, on or about March 28, 1998. |
| Racketeering Act No. 10 | Approval of final settlement of Mr. Griffin's Estate, mailed from Campbell Probate Court on or about March 30, 1998. |

124.    The Griffin Defendants' acts constitute mail fraud as prohibited by Title 18, United States Code, Sections 1341 and 1346.

Racketeering Act Nos. 11, 12, 13, 14, and 15:
Mail Fraud in the Theft of the Bradford, Jackson,
Adams, Jay Gee, and Henderson Properties and the Craig Protein Stock

125.    The Plaintiffs incorporate Paragraphs 1 through 123 of the Complaint as if fully set forth below.

126.    From in or about April 1995, and continuing until December 2010, the Griffin Defendants devised and participated in a scheme to defraud the plaintiffs.  The scheme was intended to deprive the plaintiffs of money and property and the honest services of Dennis and Griffy as Co-Executors and Co-Trustees.  The scheme was also intended to enrich the Griffin Defendants and their families.

127.    The Griffin Defendants knew that Mr. Griffin intended for the Properties and the Craig Protein stock to be bequeathed in equal shares to the plaintiffs and their sisters.  They further knew that the duties of Dennis and Griffy as Co-Executors of Mr. Griffin's Estate required them to exercise their fiduciary duty solely for the benefit and the best interest of the plaintiffs and their sisters.

128.    In spite of this knowledge, the Griffin Defendants made and caused others to tell the plaintiffs that they were executing their responsibilities as Co-Executors and Co-Trustees fairly and honestly, and that they plaintiffs were receiving the inheritance to which they were entitled.

129.    The Griffin Defendants' statements omitted the facts that they were violating the terms of the Will and the 1967 Trust, and that they were enriching themselves at the expense of the plaintiffs, through the use of the Properties by Griffin Industries, and the receipt of rental income by Martom Properties.

130.    These statements were made personally by the Griffin Defendants and by others acting on their behalf.

131.    The plaintiffs relied on these statements and omissions to their detriment by failing to object to the distribution from the Will and the 1967 Trust.

132.    To execute the scheme to defraud, the Griffin Defendants caused the use of the United States mail, related to the Racketeering Act No. 11, 12, 13, 14, and 15, as follows:

| | |
|---|---|
| Racketeering Act No. 11 | Check mailed from Martom Properties to Jackson County, MS, for tax payment, in or about March 1996. |
| Racketeering Act No. 12 | Check mailed from Martom Properties to Jackson County, MS, for tax payment, in or about March 2005. |
| Racketeering Act No. 13 | Check mailed from Martom Properties to Jackson County, MS, for tax payment, in or about March 2008. |
| Racketeering Act No. 14 | Check mailed from Martom Properties to Jackson County, MS, for tax payment, in or about March 2009. |
| Racketeering Act No. 15 | Deed mailed for recording to Jackson County, MS, in or about December 2010. |

133.    The Griffin Defendants' acts constitute mail fraud as prohibited by Title 18, United States Code, Sections 1341 and 1346.

Racketeering Act No. 16:  Hobbs Act Violation in
Depriving the Plaintiffs of Their Interest in the Cold Spring Property

134.    The Plaintiffs incorporate Paragraphs 1 through 132 of the Complaint as if fully set forth below.

135.    From in or before April 1995, and continuing until December 2010, the Griffin Defendants obstructed, delayed, and affected commerce and the movement of any article or commodity in commerce, by extortion, in the obtaining of property from the plaintiffs by threat of economic harm, and attempted and conspired so to do.

136.    The Griffin Defendants executed this scheme by threatening the plaintiffs that if they did not sign a Special Warranty Deed assigning their interest in the Cold Spring Property, they would be liable for damages for causing the $850 million merger of Griffin Industries and Darling Industries to fail.

137.    The Griffin Defendants' acts constitute a violation of the Hobbs Act, as prohibited by Title 18, United States Code, Section 1951.

Racketeering Act 17:  Wire Fraud in
Depriving the Plaintiffs of Their Interest in the Cold Spring Property

138.    The Plaintiffs incorporate Paragraphs 1 through 136 of the Complaint as if fully set forth below.

139.    From in or about April 1995, and continuing until December 2010, the Griffin Defendants devised and participated in a scheme to defraud the plaintiffs.  The scheme was intended to deprive the plaintiffs of money and property and the honest services of Dennis and Griffy as Co-Executors and Co-Trustees.  The scheme was also intended to enrich the Griffin Defendants and their families.

140.    The Griffin Defendants knew that Mr. Griffin intended for the Cold Spring Property to be bequeathed in equal shares to the plaintiffs and their sisters.  They further knew that the duties of Dennis and Griffy as Co-Executors of Mr. Griffin's Estate required them to exercise their fiduciary duty solely for the benefit and the best interest of the plaintiffs and their sisters.

141.    The Griffin Defendants executed the scheme by causing the Cold Spring Property to be transferred to Griffin Industries, although it was actually and rightfully owned by the plaintiffs and their sisters.

142.    To execute the scheme to defraud, the Griffin Defendants caused the use of interstate wires by causing an interstate telephone call to be made to Elizabeth Osborn on or about December 6, 2010.

143.    The Griffin Defendants' acts constitute wire fraud as prohibited by Title 18, United States Code, Sections 1343 and 1346.

<u>Damages</u>

144.    The acts of the Griffin Defendants described above have caused injury in the plaintiffs' business and property by reason of a violation of 18 U.S.C. § 1962, and they hereby sue therefore for threefold the damages they sustained and the cost of the suit, including a reasonable attorney's fee, in an amount to be determined at trial.

COUNT II
FRAUD
<u>(Against Defendants Dennis B. Griffin, John M. Griffin, and Robert Griffin)</u>

145.    The plaintiffs incorporate Paragraphs 1 through 144 of the Complaint as if fully set forth below.

146.    The Griffin Defendants made false statements of material fact to the plaintiffs about their parents' Estates and failed to disclose material information which caused those statements to be false and misleading. as detailed above and incorporated herein.

147.    The Griffin Defendants' statements and omissions were intended to and did deceive the plaintiffs.

148.    The Griffin Defendants' statements and omissions were intended to and did cause the plaintiffs to rely to their detriment.

149.    The plaintiffs did not discover, and should not have not reasonably discovered the fraud, until November 2010.

150.    The Griffin Defendants' actions have caused the plaintiffs damages in an amount to be proven at trial.

151.    The Griffin Defendants acted with oppression, fraud, and malice towards the plaintiffs by acting in their own self-interest without due regard for the rights of the plaintiffs and without adequate compensation for them.   The plaintiffs seek punitive damages for the Griffin Defendants' deliberate, willful, and malicious misconduct.

COUNT III
BREACH OF FIDUCIARY DUTY
AS EXECUTOR OF ROSELLEN GRIFFIN'S WILL
(Against Defendants John M. Griffin and Dennis B. Griffin)

152.    The Plaintiffs incorporate Paragraphs 1 through 151 of the Complaint as if fully set forth below.

153.    Dennis and Griffy acted in violation of their fiduciary relationship and fiduciary duties to the plaintiffs under the terms of Mrs. Griffin's Will by causing her stock in Griffin Industries to be conveyed to them, rather than to the plaintiffs and their sisters.

154.    Dennis and Griffy took an oath to faithfully perform their duties as executors.   Their failure to comply with their oath constitutes breach of fiduciary duty.

155.    The plaintiffs did not discover, and should not have reasonably discovered the fraud, until November 2010.

156.    The plaintiffs have been damaged in an amount to be proven at trial.

157.    Dennis and Griffy acted with oppression, fraud, and malice towards the plaintiffs by acting in their own self-interest without due regard for the rights of the plaintiffs and without just compensation for those injuries.  The plaintiffs seek punitive damages for this conduct.

COUNT IV
BREACH OF FIDUCIARY DUTY
AS EXECUTORS OF JOHN L. GRIFFIN'S WILL
AND TRUSTEES OF JOHN L. GRIFFIN'S TRUST
(Against Defendants John M. Griffin and Dennis B. Griffin)

158.    The Plaintiffs incorporate Paragraphs 1 through 157 of the Complaint as if fully set forth below.

159.    Dennis and Griffy also acted in violation of their fiduciary relationship and fiduciary duties to the plaintiffs under the terms of Mr. Griffin's Will through the conveyances of the Adams Property and the Jay Gee from Mr. Griffin's Estate to Martom Properties, rather than to the 1967 Trust.  Dennis and Griffy did not have the right, capacity, or authority under Mr. Griffin's Will to transfer the properties to Griffin Industries or to Martom Properties.  Dennis and Griffy failed to properly administer some or all of the Properties as assets of Mr. Griffin's Estate.  The misrepresentation of trust assets and the transfer of trust assets without fair value is constructive fraud.

160.    Dennis and Griffy also acted in violation of their fiduciary relationship and fiduciary duties to the plaintiffs through the conveyances of Jackson Property, the Henderson Property, and the Bradford Property from the 1967 Trust to Martom Properties, rather than to the plaintiffs and their sisters.

161.    Dennis and Griffy also acted in violation of their fiduciary relationship and fiduciary duties to the plaintiffs through the conveyances of the stock of Craig Protein to Griffin Industries rather than to the plaintiffs and their sisters.

162.    Dennis and Griffy also acted in violation of their fiduciary relationship and fiduciary duties to the plaintiffs through the conveyances of the Cold Spring Property from Mr. Griffin's Estate to Griffin Industries, rather than to the 1967 Trust.

163.    Dennis and Griffy also acted in violation of their fiduciary relationship and fiduciary duties to the plaintiffs through the conveyances of the Craig Protein Stock from Mr. Griffin's Estate to Griffin Industries, rather than to the 1967 Trust.

164.    Dennis and Griffy also did not have the right, capacity, or authority under the 1967 Trust to transfer the properties to Griffin Industries or to Martom Properties. Dennis and Griffy failed to properly administer some or all of the misappropriated Properties as assets of the 1967 Trust.  The misrepresentation of trust assets and the transfer of trust assets without fair value is constructive fraud.

165.    Dennis and Griffy took an oath to faithfully perform their duties as executors.  Their failure to comply with their oath constitutes breach of fiduciary duty.

166.    The plaintiffs did not discover, and should not have reasonably discovered the fraud, until November 2010.

167.    The plaintiffs have been damaged in an amount to be proven at trial.

168.    The Dennis and Griffy acted with oppression, fraud, and malice towards the plaintiffs by acting in their own self-interest without due regard for the rights of the plaintiffs and without just compensation for those injuries.  The plaintiffs seek punitive damages for this conduct.

COUNT V
CIVIL CONSPIRACY/AIDING AND ABETTING
(Against Dennis B. Griffin, John M. Griffin, and Robert Griffin)

169.     The plaintiffs incorporate Paragraphs 1 through 168 of the Complaint as if fully set forth below.

170.     The Griffin Defendants stood to reap material and substantial financial gain by misappropriating Griffin stock and assets away from the 1967 Trust and/or Estate, in violation of the provisions against self-dealing and conflicts of interest.

171.     The Griffin Defendants knowingly joined with or aided and abetted each other in an enterprise constituting:

     a.     a breach of their fiduciary relationships and constructive fraud; and

     b.     loss of inheritance by fraud, duress, or other tortious means,

and the Griffin Defendants are thereby jointly and severally liable for damages.

172.     The Griffin Defendants conspired in a corrupt or unlawful combination or agreement to do by concert of action an unlawful act, or to do a lawful act by unlawful means and are jointly and severally liable for damages.

173.     The plaintiffs have been damaged in an amount to be proven at trial.

174.     The Griffin Defendants acted with oppression, fraud, and malice towards the plaintiffs by acting in their own self-interest without due regard for the rights of the plaintiffs and without adequate compensation for them.   The plaintiffs seek punitive damages for the Griffin Defendants' deliberate, willful, and malicious misconduct.

## COUNT VI
## TORTIOUS INTERFERENCE WITH AN INHERITANCE
(Against Dennis B. Griffin, John M. Griffin, Robert Griffin, and Martom Properties)

175.    The Plaintiffs incorporate Paragraphs 1 through 174 of the Complaint as if fully set forth below.

176.    The Griffin Defendants and Martom Properties were in a unique position to know, did know, should have known, and/or were reckless in not knowing:  (i) that the Cold Spring Property was titled in the name of "John L. Griffin, Trustee"; (ii) that a substantial portion of the Griffin Industries stock of Mr. Griffin and Mrs. Griffin should have been conveyed to plaintiffs and their sisters in equal measure; and (iii) that all property owned by Mr. Griffin and the 1967 Trust should have been conveyed to the plaintiffs and their sisters.

177.    By transferring the property away from the 1967 Trust and/or Estate, the Griffin Defendants and Martom Properties, by fraud, duress or other tortious means, intentionally prevented the plaintiffs from receiving from their parents an inheritance that they would otherwise have received.  The Griffin Defendants and Martom Properties are subject to liability for damages to the plaintiffs for loss of the inheritance.

178.    The plaintiffs have been damaged in an amount to be proven at trial.

179.    The Griffin Defendants and Martom Properties acted with oppression, fraud, and malice towards the plaintiffs by acting in their own self-interest without due regard for the rights of the plaintiffs and without adequate compensation for their loss. The plaintiffs seek punitive damages for the Griffin Defendants' and Martom Properties' deliberate, willful, and malicious misconduct.

COUNT VII
NEGLIGENCE AND/OR GROSS NEGLIGENCE
ARISING OUT OF THE ESTATE ADMINISTRATION
FOR ROSELLEN GRIFFIN
(Against John M. Griffin and Dennis B. Griffin)

180.    The plaintiffs incorporate Paragraphs 1 through 179 of the Complaint as if fully set forth below.

181.    After Mrs. Griffin's death, Dennis and Griffy, as Co-Executors of Mrs. Griffin's Estate, owed a duty of care to the plaintiffs to diligently and professionally act as the Executors, to maximize the value of the Estate for the benefit of the plaintiffs as beneficiaries, to respond promptly, honestly, and fully to requests made by the plaintiffs, and to treat all beneficiaries equally.

182.    By virtue of the above-described conduct, Dennis and Griffy have breached the aforementioned duties owed to the plaintiffs.

183.    Consequently, the plaintiffs have suffered harm for which they are entitled to recover compensatory damages.

184.    Furthermore, as a result of Dennis' and Griffy's grossly negligent conduct, the plaintiffs are entitled to the recovery of punitive damages.

COUNT VIII
NEGLIGENCE AND/OR GROSS NEGLIGENCE
ARISING OUT OF THE ESTATE AND TRUST ADMINISTRATION
FOR JOHN L. GRIFFIN
(Against John M. Griffin and Dennis B. Griffin)

185.    The plaintiffs incorporate Paragraphs 1 through 184 of the Complaint as if fully set forth below.

186.    After Mr. Griffin's death, Dennis and Griffy, as Co-Executors of Mr. Griffin's Estate and Co-Trustees of the 1967 Trust, owed a duty of care to the plaintiffs

and to the Estate and the Trust to diligently and professionally act as the Executors and Trustees, to maximize the value of the Estate and the Trust for the benefit of the plaintiffs as beneficiaries, to respond promptly, honestly, and fully to requests made by the plaintiffs, and to treat all beneficiaries equally.

187.     By virtue of the above-described conduct, Dennis and Griffy have breached the aforementioned duties owed to the plaintiffs.

188.     Consequently, the plaintiffs have suffered harm for which they are entitled to recover compensatory damages.

189.     Furthermore, as a result of Dennis' and Griffy's grossly negligent conduct, the plaintiffs are entitled to the recovery of punitive damages.


COUNT IX
PROFESSIONAL NEGLIGENCE
(Against Keating, Muething & Klekamp)

190.     The plaintiffs incorporate Paragraphs 1 through 189 of the Complaint as if fully set forth below.

191.     At all times relevant to this Complaint, the plaintiffs and their families were represented by attorneys from Keating on estate planning and other matters.  The representation continued until late 2012.

192.     Keating owed the plaintiffs a duty of loyalty, including the duty not to undertake any representation for another client which was contrary to the plaintiffs' interests.

193.     Keating has violated that duty, causing the plaintiffs to be injured in an amount to be proven at trial.

194.   Furthermore, as a result of Keating's grossly negligent conduct, the plaintiffs are entitled to the recovery of punitive damages.

PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully demand judgment against the Defendants as follows:

A.   On Count I, three times the actual damages they have incurred, including:  (a) the value of their rightful share of Mr. Griffin's stock in Griffin Industries, including the income and distributions therefrom; (b) the value of their rightful share of Mrs. Griffin's stock in Griffin Industries, including the income and distributions therefrom; (c) the value of the Craig Protein stock, including the income and distributions therefrom; (d) the value of their rightful share of the value of the Jackson Property, the Henderson Property, the Adams Property, the Bradford Property, the Jay Gee Property, and the Cold Spring Property, as well as lost rents, and profits;

B.   On Counts II, III, IV, V, VI, VII, VIII, and IX, conveyance of the Jackson Property, the Henderson Property, the Adams Property, the Bradford Property, the Jay Gee Property, and the Cold Spring Property to the plaintiffs;

C.   On Counts II, III, IV, V, VI, VII, VIII, and IX, compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, including (a) the value of their rightful share of Mr. Griffin's stock in Griffin Industries, including the income and distributions therefrom, (b) the value of their rightful share of Mrs. Griffin's stock in Griffin Industries, including the income and distributions therefrom, (c) the value of the Craig Protein stock, including the income and distributions therefrom, (d) the value of their rightful share of the value of the Jackson Property, the Henderson Property, the Adams Property, the Bradford Property, the Jay Gee Property, and the Cold Spring Property, as well as lost rents, and profits;

D.   On Counts II, III, IV, V, VI, VII, VIII, and IX, punitive damages from all Defendants, jointly and severally;

E.   A complete and full accounting by Defendants John M. Griffin and Dennis B. Griffin, together with any third parties engaged in any transactions with them, including, without limitation, an

46

accounting of all property, real or personal, received by them or persons and entities under their control related to the 1967 Trust, Mr. Griffin's Estate, and Mrs. Griffin's Estate, as well as all gains, profits, and advantages obtained as a result of their wrongful acts and the recovery of such gains, profits, and advantages;

F.      A complete and full accounting by Defendants John M. Griffin and Dennis B. Griffin of all assets received, disbursed, and/or transferred and the value received and all liabilities incurred, by the 1967 Trust, Mr. Griffin's Estate, and Mrs. Griffin's Estate;

G.      That the Court impose a constructive trust for the benefit of the plaintiffs on all funds, assets, gains, profits or other things of value derived by Defendants John M. Griffin, Dennis B. Griffin, or their agents as a result of the breach of their fiduciary duties owed to the plaintiffs and/or requiring them to disgorge all of the ill-gotten gains obtained by the Defendants John M. Griffin, Dennis B. Griffin, or their agents;

H.      That John M. Griffin and Dennis B. Griffin be removed as Co-Trustees of the 1967 Trust and that the 1967 Trust be closed;

I.      That the Court award attorney's fees and pre-judgment interest;

J.      A trial by jury on all issues so triable; and

K.      That the plaintiffs be granted all other relief to which they appear entitled.

Respectfully submitted,

/s/ Kent Wicker
Kent Wicker
Jennifer A. Schultz
REED WICKER PLLC
Waterfront Plaza
321 West Main Street, Suite 2100
Louisville, Kentucky  40202
(502) 572-2500